UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -x          <u>FILED VIA ECF</u>

UNITED STATES OF AMERICA          :

                                  :          S1 07 Cr. 1066 (VM)

       - v. -                     :

NORMAN HSU,                       :

            Defendant.            :

- - - - - - - - - - - - - - - -x


## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
        of America.


RUA M. KELLY
ALEXANDER J. WILLSCHER
Assistant United States Attorneys
     - Of Counsel -

# TABLE OF CONTENTS

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Loss Amount . . . . . . . . . . . . . . . . . . . . . . . 3

      A.   Relevant Facts . . . . . . . . . . . . . . . . . . 3

      B.   Applicable Law . . . . . . . . . . . . . . . . . . 4

      C.   Discussion . . . . . . . . . . . . . . . . . . . . 7

III.  Sophisticated Means . . . . . . . . . . . . . . . . . . 11

      A.   Relevant Facts . . . . . . . . . . . . . . . . . . 11

      B.   Applicable Law . . . . . . . . . . . . . . . . . . 14

      C.   Discussion . . . . . . . . . . . . . . . . . . . . 15

IV.   Number of Victims . . . . . . . . . . . . . . . . . . . 18

V.    Acceptance of Responsibility . . . . . . . . . . . . . 19

VI.   Obstruction of Justice . . . . . . . . . . . . . . . . 21

      A.   Relevant Facts . . . . . . . . . . . . . . . . . . 21

      B.   Applicable Law . . . . . . . . . . . . . . . . . . 22

      C.   Discussion . . . . . . . . . . . . . . . . . . . . 23

VII.  Section 3553(a) Factors . . . . . . . . . . . . . . . . 25

      A.   Nature and Circumstances of the Offense,
           History and Characteristics
           of the Defendant . . . . . . . . . . . . . . . . . 25

      B.   Need to Protect the Public from
           Further Crimes of the Defendant
           and Afford Adequate Deterrence . . . . . . . . . . 27

VIII. Restitution . . . . . . . . . . . . . . . . . . . . . . 28

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . 29

## I.    Introduction

The Government respectfully submits this memorandum for the Court's consideration in connection with sentencing for defendant Norman Hsu, scheduled for Tuesday, September 29, 2009, at 2:00 p.m., and in response to the defendant's sentencing memorandum of September 23, 2009 (cited herein as "Br.").

Hsu was convicted, following a six-day jury trial, of four counts of violating the campaign finance laws.  In addition, on the Thursday before trial, Hsu entered a guilty plea to ten counts of mail and wire fraud stemming from his Ponzi scheme.  In total, the defendant defrauded hundreds of investors out of more than $50 million through his Ponzi scheme, and manipulated the campaign finance laws to enhance his public profile and further bolster investor confidence in his massive financial fraud.

In his brief, Hsu objects to the offense level computation in the Presentence Report ("PSR"), contending that the United States Probation Office ("Probation"): (1) improperly enhanced his offense level by calculating the loss amount as between $50 million and $100 million pursuant to § 2B1.1(b)(1)(M) of the United States Sentencing Guidelines (the "Sentencing Guidelines" or "U.S.S.G."); and (2) improperly denied him a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), where Hsu entered a partial guilty plea prior to trial.  In addition, Hsu asks the Court to reject the

Government's argument that the sentence should be adjusted upward by two levels because his fraudulent scheme involved the use of sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(9)(c).

For the reasons stated below, the Government respectfully submits that the Court should adopt the findings of the PSR with regard to loss amount, obstruction of justice, and acceptance of responsibility, and additionally should adjust Hsu's sentence upward for the use of sophisticated means. Accordingly, the Government respectfully submits that under the Sentencing Guidelines, the adjusted offense level is 41 and the defendant's criminal history category is II, resulting in a Guidelines range of 360 months' imprisonment to life. The Government submits that a sentence within the Guidelines range is reasonable and appropriate under 18 U.S.C. Section 3553(a).[1]

---

[1]    Indeed, the PSR's Guidelines computation is conservative. Although it is probably warranted, the Government is not seeking an enhancement on the ground that Hsu abused a position of private trust in connection with his solicitation of investors, pursuant to U.S.S.G. § 3B1.3. Although Hsu did not have discretionary authority over his investors' money as that term is defined by the caselaw, see, e.g., United States v. Jolly, 102 F.3d 46, 48 (2d Cir. 1996), Hsu did develop very close personal relationships with many of his investors, wherein they relied on and trusted him in a way that is not true of typical borrow-lender relationships. See United States v. Hirsch, 239 F.3d 221, 228 (2d Cir. 2001); Jolly, 102 F.3d at 49. Indeed, several of the witnesses at trial described how they were extremely close personal friends of Hsu and how this relationship greatly influenced their trust in him and their decisions to invest money with him. For example, Marina and Winkle Paw testified that their family treated Hsu as a family member; so much so that Hsu attended the Paws' birthday and wedding celebrations. (Tr. 472, 486-87, 498). Other witnesses, such as Suzanne Raffaelli and

**II. The Loss Amount Attributable to the Defendant's Scheme Was Between $50 Million and $100 Million**

    A.   <u>Relevant Facts</u>

Norman Hsu operated a Ponzi scheme through which he obtained million of dollars from investors by fraudulently claiming that he would invest their money in promising clothing or high-technology ventures. Hsu made no such investments, however, and used the money instead for his own personal use. Hsu also used the money to perpetuate the scheme by providing some individuals with a profit on their earlier investments in order to encourage further investment. Some of his victims profited from their initial investments with Hsu, but lost money in their final investment with him. Other of Hsu's victims never obtained any profit from Hsu and additionally lost all of the principal that they had invested.

Hsu sold his victims short-term investments in which he promised, at the end of a few months, to repay the investor's principal and to pay the investor an interest payment. To induce these investments, Hsu provided post-dated checks to his

_____

Susan Chilman, testified that they were very close friends with Hsu long before they began investing with him. (Tr. 170, 173, 361-62, 404). Their strong trust in Hsu was a large reason why they both invested with him and made donations to political candidates at Hsu's direction (for which Hsu reimbursed them). Despite its probable applicability, the Government is not seeking the abuse of trust enhancement. However, the Government submits that the Court can properly consider Hsu's abuse of his friends' trust as part of its analysis under 18 U.S.C. § 3553(a).

investors that included both the principal and interest that was
to be due when the investment matured.  When Hsu's fraudulent
scheme collapsed in September 2007, he had issued post-dated
checks worth more than $100 million to his victims.

    B.  Applicable Law

    Both the Second Circuit and other Courts of Appeals have
held that, in cases such as this, where the defendant stole money
from repeat investors, the loss amount is simply the amount of
principal that the victims had invested in the final transaction.
See United States v. Alfonso, 479 F.3d 570, 572-73 (8th Cir.
2007) (holding "that the district court properly declined to
offset victims' gains on one investment against their losses on
subsequent investments"); United States v. Carrozzella, 105 F.3d
796, 805 (2d Cir. 1997) ("We have held that loss in fraud cases
includes the amount of property taken, even if all or part has
been returned. . . .  One reason for this rule is that, as in
Carrozzella's case, the return of money as interest or other
income is often necessary for the scheme to continue.") (internal
citations omitted); United States v. Mucciante, 21 F.3d 1228,
1237-38 (2d Cir. 1994) ("Although [defendant] returned some of
[victim-1]'s money, and repaid [victim-2] and [victim-3], he did
so as part of a meretricious effort to maintain their
confidences.  He is therefore not entitled to credit for sums
returned, or for sums spent for [victim-1]'s benefit.").

In November 2003, the United States Sentencing Commission amended the Sentencing Guidelines to clarify that "bargained for" interest should not be included in the calculation of loss amount. See U.S.S.G. § 2B1.1, comment. (n. 3D(i)); U.S.S.G. Amendment 617, pp. 182-83 (November 1, 2003).[2] Accordingly, in cases in which a defendant induces a victim to invest principal in return for a sizable interest payment, but the victim then fails to repay either the principal or the promised interest, the loss amount includes only the principal, and not the interest. See United States v. Morgan, 376 F.3d 1002, 1014 (9th Cir. 2004).

This rule regarding "bargained for" interest only applies to outstanding investments, and not to interest that the defendant paid on prior investments in furtherance of his scheme to

---

[2] Prior to the passage of Application Note 3D(i), several circuits, including the Second, had held that "bargained for interest" was properly included in the determination of loss amount. See United States v. Nolan, 136 F.3d 265, 273 (2d Cir. 1998) (loss amount included the principal that victim had invested plus the unpaid interest that the defendant had promised to pay the victim); United States v. Porter, 145 F.3d 897, 899-901 (7th Cir. 1998) (same); United States v. Aptt, 354 F.3d 1269, 1277-78 (10th Cir. 2004) (addressing conduct that occurred prior to 2003); United States v. Lowder, 5 F.3d 467, 470-71 (10th Cir. 1993) ("Defendant defrauded his victims by promising them a guaranteed interest rate of 12%. He induced their investment by essentially contracting for a specific rate of return. He also sent out account summaries, showing the interest accrued on their investment. This is analogous to a promise to pay on a bank loan or promissory note, in which case interest may be included in the loss."); see also United States v. Szeja, 127 Fed. Appx. 890, 892-93 (7th Cir. 2005) ("[W]here the defendant makes specific representations about a property's value or promises the victim a particular return on an investment, the defendant's own valuation can be used to calculate loss at sentencing.").

defraud.  See Alfonso, 479 F.3d at 572-73; United States v.

Coghill, 204 Fed. Appx. 328, 330 (4th Cir. 2006).  For example,

in Coghill, the Fourth Circuit explained that Application Note

3D(i) does not apply to interest that the defendant had

previously paid:

> The exclusion of interest from the
> calculation of loss under the Guidelines
> serves to prevent victims from recovering all
> interest they could have earned had the fraud
> never occurred.  See United States v. Morgan,
> 376 F.3d 1002, 1014 (9th Cir. 2004).  It does
> not follow, as [defendant] suggests, that
> payments already made that both parties
> understood would be applied in part to
> interest due and the remainder to principal
> ought to instead be applied solely to
> principal for purposes of calculating loss.
> Rather, the district court properly
> calculated loss by determining the
> outstanding principal balance of the loan
> less the amount the victims were able to
> recover through liquidation of the collateral
> provided to secure the loan.

204 Fed. Appx. At 330.

The Eighth Circuit's recent decision in Alfonso, is on all

fours with this case.  Like Hsu, the defendant in Alfonso

operated a Ponzi scheme in which he had repeat investors; i.e.,

the victims received a profit on prior deals but sustained heavy

losses on the final investment.  The defendant contended that the

loss amount for any particular investor should offset that

investor's final loss by the earlier profits that the investor

received from the defendant.  Alfonso, 479 F.3d at 571-72.  The

Court of Appeals disagreed, holding that "that the district court

-6-

properly declined to offset victims' gains on one investment against their losses on subsequent investments." Id. at 573. The Court explained that:

> Ponzi scheme operators do not provide investors with gains out of the goodness of their hearts or to lessen damage to investors, but to keep their fraudulent scheme running. . . . Accordingly, they should not reap sentencing benefits for making payments to investors that are designed to perpetuate their scheme.
>
> The considerations that underlie [U.S.S.G. § 2B1.1, cmt. n. 3(F)(iv)]'s prohibition against offsetting one investor's losses by another investor's gains also counsel against allowing a defendant to use a victim's gains on an earlier investment to offset losses on that same victim's later investment. Just as gains realized by an individual investor lure other investors into the scheme, those gains may also entice that same investor to make further contributions to the fraudulent enterprise. A repeat investor is essentially in the same position as a new investor for these purposes. To hold otherwise would be to reward defendants for conduct that perpetuates, and constitutes a component of, the Ponzi scheme.

Id. at 572-73.

Accordingly, loss in this case is calculated by totaling the amount of principal that Hsu did not repay to his investors when his Ponzi scheme collapsed in September 2007.

C.   Discussion

When Hsu's scheme ended, his victims were holding post-dated checks from Hsu totaling more than $100 million. The checks were not honored due to insufficient funds in Hsu's bank accounts.

-7-

The following list of bounced checks is not all-inclusive; instead, it merely provides examples sufficient to demonstrate that the loss amount attributable to Hsu's scheme is easily in excess of $50 million:[3]

1.  ***Source Financing Investors, LLC*** [Tab 3]:  Yau Cheng ran Source Financing Investors, LLC.  (Tr. 46-47).  She testified at trial that Source had a total of 113 victims who invested in Hsu via Source.  (Tr. 54-55).  When Hsu's scheme collapsed, Source was holding 37 post-dated checks from Hsu worth $55 million.  (Tr. 69).  **Loss = $55,000,000.**

2.  ***Briar Wood Investments, LLC ("Briar Wood")*** [Tab 4]:  Martin Waters ran Briar Wood.  (Tr. 104).  Waters testified at trial that Briar Wood had a total of 108 victims who invested in Hsu via Briar Wood.  (Tr. 105, 111).  When Hsu's scheme collapsed, Briar Wood was due a total return of $28,119,659 on the deals maturing on the following four dates:
    a.   September 5, 2007: $4,525,456;
    b.   September 28, 2007: $7,439,949;
    c.   November 2, 2007: $8,465,520;
    d.   December 6, 2007: $7,688,734;
    **Loss = $28,119,659.**

3.  ***K-1 Financial Investments ("K-1")*** [Tab 5]: Steven Kwon ran K-1.  (Tr. 133).  Kwon testified at trial that K-1 had a total of 25 victims who invested in Hsu via K-1.  (Tr. 133-34).  When Hsu's scheme collapsed, K-1 was holding three post-dated checks from Hsu worth $1,012,620, which were not honored due to insufficient funds. (Tr. 139; GX 450-52).  **Loss = $1,012,620.**

4.  ***Nicole Chorvat*** [Tab 6]: Chorvat invested with Hsu

---

[3] A copy of the September 2007 account statements for two of Hsu's accounts – the Components and Next Components accounts – are attached at Tabs 1 and 2, respectively.  The bounced checks are reflected on those statements.

both in her own name and the name of her corporation, Novalis Corporation. (Tr. 163). Chorvat testified that when Hsu's scheme collapsed, she was holding four post-dated checks from Hsu worth $269,970. (Tr. 159, GX 406-09). She was only able to cash one check for $86,718. (Tr. 159-60). The three other checks, worth approximately $182,252, were not honored due to insufficient funds. (Tr. 160, GX 407-09). **Loss = $182,252.**

5. ***Solange Sandy*** [Tab 7]: Sandy testified at trial that when Hsu's scheme collapsed, she was holding two post-dated checks from Hsu worth $343,522. (Tr. 591; GX 141-42). The two checks were not honored due to insufficient funds. (Tr. 591; GX 141-42). **Loss = $343,522.**

6. ***Brian Miller*** [Tab 8]: Brian Miller began personally investing with Hsu in December 2005. When Hsu's scheme collapsed, he was holding two post-dated checks from Hsu worth $337,872. The two checks were not honored due to insufficient funds. **Loss = $337,872.**

7. ***Britt Miller*** [Tab 9]: Britt Miller began personally investing with Hsu in December 2005. When Hsu's scheme collapsed, he was holding two post-dated checks from Hsu worth $307,449. The two checks were not honored due to insufficient funds. **Loss = $307,449.**

8. ***Susan Chilman*** [Tab 10]: Chilman testified at trial that when Hsu's scheme collapsed, she had one outstanding check from Hsu in the amount of $213,620. (Tr. 396; GX 304A). When Chilman confronted Hsu about his criminal history, Hsu wrote her a new check for $175,000 (and voided the old check), but did not pay her for the vast bulk of the interest that she had been promised. (Tr. 396-97; GX 315). **Loss = $38,620.**

9. ***April Chu*** [Tab 11]: Chu invested with Hsu both in her own name and in the names of a variety of corporations, LLCs, and trusts that she controlled. When Hsu's scheme collapsed, she was holding post-dated checks from Hsu that were not

honored due to insufficient funds as follows:

    e.    Paul S. Hui Marital Trust - Two checks for
            $741,600;
    f.    Waihui - One check for $110,895;
    g.    Royce Knight, Inc. - One check for $334,484;
    h.    Jools London, Inc. - Three checks for
            $1,617,833;
    i.    Mauinokaoi LLC - Two checks for $361,916;
    j.    AWCC Corp. - Two checks for $195,942;
    k.    AWCC Corp. - One check for $205,591;
    l.    ACMC Corp. - One check for $181,404;
    m.    Brand Emporium Management Group, Inc. - One
            check for $278,152;
    n.    BEMG Logistics, Inc. - One check for $123,883
**Loss = $4,151,700.**

10.    ***Albert Choi*** [Tab 12]: Choi invested with Hsu both
        personally and via his IRA account.  At the time
        that Hsu's scheme collapsed, he was holding four
        post-dated checks from Hsu worth $3,755,448.  The
        checks were not honored due to insufficient funds.
        **Loss = $3,755,448.**

11.    ***Dilini Management Group, LLC*** ("Dilini") [Tab 13]:
        Paul Su ran Dilini, which consisted of eleven
        investors.  At the time that Hsu's scheme
        collapsed, Dilini was invested in four deals in
        which Hsu had promised to repay a total of
        $9,453,204.  The checks were not honored due to
        insufficient funds.  **Loss = $9,453,204.**

    **GRAND TOTAL    =    $102,702,346**

This total amount of outstanding checks includes both the
principal that the victims invested it the final deal and the
interest that Hsu had promised to pay to them.  Accordingly,
pursuant Application Note 3D(i), the $102,702,346 must be reduced
by the promised interest.  Hsu typically offered his victims
returns on their investments in the range of 14 to 20 percent.
Assuming, for the sake of argument, that Hsu had promised to pay

each of his victims a 25 percent return on the final deal, the amount of principal that the victims would have invested in the final deals would easily exceed the $50 million threshold set by the Guidelines: $102,702,346 /1.25 = $82,161,876.

Accordingly, the loss amount attributable to Hsu's fraud was more than $50,000,000, but less than $100,000,000, and his offense level should be enhanced by 24 levels, pursuant to U.S.S.G. § 2B17.1(b)(1)(M).

### III. The Defendant's Scheme Involved the Use of Sophisticated Means

The defendant's Offense Level should be adjusted upward by two levels because his fraudulent scheme involved the use of sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(9)(C).

A.  <u>Relevant Facts</u>

The fraudulent conduct in which Hsu engaged involved sophisticated means.  Were it not for the sophistication of the complete series of the steps Hsu took, he could not have concealed this scheme for the ten-year period that it operated or so closely associated himself with some of the country's preeminent political leaders.  Hsu's dual-investment product (clothing and high tech) Ponzi scheme involved significantly more planning and detail than the garden-variety fraud scheme that involves only a simple investment scam and a handful of investors.  Beyond its stunning size, scope, and longevity, Hsu's scheme was sophisticated in that it required him to commit

multiple violations of campaign-finance fraud to facilitate the
scheme. Namely, in order to gain access to high-profile
politicians, and thereby enhance his legitimacy and credibility
in the eyes of those who were investing in his Ponzi scheme, Hsu
embarked on a course of conduct that involved extensive
additional violations of federal criminal law.

Hsu took the following steps, among others, to perpetrate
his fraud:

1.  As with all Ponzi schemes, Hsu constantly needed to
    lure more money and more investors into the scheme. To
    do this, Hsu raised his profile and his legitimacy in
    the eyes of investors by cultivating connections to
    preeminent politicians, such as Hillary Clinton, Bill
    Clinton, and Barack Obama. (Tr. 58, 132-33, 157-58).
    Hsu's victims testified that they were willing to
    invest in Hsu without conducting sufficient due
    diligence because they believed that the politicians
    with whom Hsu associated had already vetted his
    integrity. (Tr. 133). To gain access to these
    politicians, Hsu became a top fund-raiser for several
    of them. (Tr. 151). And to do this, Hsu illegally
    directed several people to make political donations in
    their own names while using Hsu's money. Hsu was
    convicted of this conduct at trial.

2.  Hsu's fraud also involved the creation of two
    corporations, Components and Next Components, that were
    little more than empty shells. Neither of the
    companies performed the business that Hsu claimed they
    did. Instead, Hsu used the corporations to facilitate
    his Ponzi scheme. For example, Hsu convinced investors
    that he was legitimate by showing them the companies'
    articles of incorporation and corporate bylaws. (Tr.
    57). To conceal his fraud, Hsu also lied to investors
    and said that his "partners" in the companies refused
    to allow investors to see the companies' financials
    documents because they contained the partners'
    sensitive personal information. (Tr. 57). In fact,
    Hsu did not have any real partners in either Components
    and Next Components, and certainly none that prevented

him from disclosing the companies' financial
information.

3.      Hsu created promotional documents for his companies,
        which he gave to his investors, that falsely claimed
        that his companies had an extensive "Board of
        Advisory."  [Tab 14].

4.      To convince investors of his legitimacy, Hsu sent them
        fake purchase orders from clothing designers with whom
        he claimed to be in business.  For example, Hsu sent
        Yau Cheng a fake purchase order from the company "4
        You."  [Tab 15].  In fact, 4You has never done business
        with Hsu.  [Tab 16].

5.      The duration of Hsu's scheme was stunning, lasting from
        at least 1997 until his arrest in September 2007.
        During those years, Hsu's victims invested tens of
        millions of dollars in hundreds of "deals" that Hsu
        sponsored.

6.      To facilitate his scheme, Hsu suggested to his largest
        investors that they create "funds" that would organize
        other people to invest with Hsu. (Tr. 46, 105).  The
        people running these hedge funds often retained outside
        legal counsel to help them organize and to create
        governing documents.

7.      Hsu created an aura of legitimacy by attending the
        semi-annual MAGIC trade show in Las Vegas, which was
        held for members of the apparel industry.  Although Hsu
        was not, in fact, conducting any business in the
        clothing industry, he made sure to let his investors
        know that he was attending these trade shows. (Tr.
        40).

8.      Hsu created fictitious loan documents or "deal sheets"
        with terms designed to reassure even conservative
        investors.

9.      Hsu described the investment deals to his investors as
        a way to earn high interest rates on a virtually risk-
        free basis, particularly as a result of his contacts
        with clothing manufacturers in Asia, where labor costs
        were minimal.  His convincing lies and detailed
        explanations convinced many sophisticated investors.
        For example, one of Hsu's largest investors, Yau Cheng,
        has worked in the business world for fifteen years,

-13-

most recently as Director of Communications and Strategy at Merrill Lynch. (Tr. 37). Likewise, another of Hsu's investors, Dr. Steven Kwon, has both a medical doctor degree ("MD") and a masters in business administration ("MBA"). (Tr. 125).

10. To add further legitimacy to these "investments," Hsu directed an accountant to prepare 1099-Dividend statements to send to his victims so that they could file their income-tax returns.

11. To add further legitimacy, Hsu falsely told investors that his clothing deals had such low risk because he had engaged the services of a renown firm, Heller, to providing factoring services.

12. Hsu allocated a portion of the funds he stole to making payments to investors, thereby creating the false impression that his investments were successful, reassuring current investors, prolonging his scheme, and attracting new victims with additional funds.

B.   Applicable Law

U.S.S.G. § 2B1.1(b)(9)(C) provides for a two-level enhancement of a defendant's offense level if "the offense otherwise involved sophisticated means." The Application Note to the Guideline explains that "sophisticated means" applies to conduct that is "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and provides examples such as the hiding of assets or transactions through the use of fictitious entities, corporate shells, or offshore bank accounts. See U.S.S.G. § 2B1.1(b)(9)(C), cmt. n. 8.

Where, as here, a defendant's scheme involved various steps, the enhancement may apply "even if each step in the scheme was

not elaborate." United States v. Jackson, 346 F.3d 22, 25 (2d
Cir. 2003), vacated on other grounds sub nom. Lauersen v. United
States, 543 U.S. 1097 (2005).  In other words, "[r]epetitive or
coordinated conduct, though no one step is particularly
complicated, can be a sophisticated scheme."  United States v.
Finck, 407 F.3d 908, 915 (8th Cir. 2005); see also United States
v. Jackson, 346 F.3d at 25 (upholding enhancement where "the
total scheme was sophisticated in the way all the steps were
linked together so that [defendant] could perceive and exploit
different vulnerabilities in different systems in a coordinated
way"); United States v. Evano, 553 F.3d 109, 113 (1st Cir. 2009)
("The scheme may be sophisticated even if the individual elements
taken alone are not."); United States v. Wayland, 549 F.3d 526,
529 (7th Cir. 2008) ("Even if [defendant's] individual actions
could be characterized as unsophisticated, we would follow the
approach of our sister circuits and affirm [defendant's] sentence
on the ground that his overall scheme, which lasted nine years
and involved a series of coordinated fraudulent transactions, was
complex and sophisticated."); United States v. Lewis, 93 F.3d
1075, 1083 (2d Cir. 1996) (holding, in tax case, that
sophisticated means enhancement applied even when "each step in
the planned tax evasion was simple, [because] when viewed
together, the steps comprised a plan more complex than merely
filling out a false tax return").

C.  <u>Discussion</u>

The scheme here was at least as complex as others in which courts in this Circuit and elsewhere have held the enhancement to apply.  For example, in <u>Jackson</u> the defendant's scheme, which lasted for less than one year, involved a defendant who targeted wealthy individuals, obtained personal information about his targets, and thereafter made expensive purchases over the internet using that personal information.  <u>Jackson</u>, 346 F.3d at 24-25.  To perpetrate that scheme, the defendant: used the internet to identify his targets and then purchase certain personal information, impersonated his targets over the phone (using pre-paid phone cards to prevent tracking) and contacted credit card companies to manipulate credit lines or change certain personal information, e.g., he changed the shipping address to hotels, and ordered merchandise to be sent to the hotels where he would pose as the recipient to retrieve his merchandise.

In <u>United States</u> v. <u>Lewis</u>, 93 F.3d 1075 (2d Cir. 1996), a tax fraud case, the defendant drew checks on his personal bank accounts payable to various individuals and entities.  <u>Id.</u> at 1077.  The defendant then deposited these checks into bank accounts that he opened in the names of the sham entities, creating the false impression that payments were made to actual businesses and charities.  <u>Id.</u>  Finally, the money was

transferred from the sham accounts to another set of bank accounts, from which the money was used for the defendant's personal expenses. Id. Lewis improperly claimed tax deductions on much of this money. Id. In upholding the application of the sophisticated means enhancement, the Lewis court found that "there was a three-step scenario that used numerous fictitious entities and multiple checks . . . ." Id. at 1082. The Court noted that the "evasion strategy," which lasted for eight years, "required as much planning as was involved in some cases deemed sophisticated." The Court reasoned:

> the repetitive conduct here is relevant because it demonstrates that more than routine planning was involved. By writing so many checks to so many different entities, Lewis' actions lent a quality of authenticity and a higher level of intricacy to the plan than if he had only written a few large checks each year to a single entity.

Id. at 1083.

Here, the scope and breadth of Hsu's scheme, which lasted roughly ten years, demonstrates more than routine planning and a careful effort to conceal his fraud by making strategic payments while he was actually siphoning the money. See, e.g., Jackson, 346 F.3d at 25 (noting that the application note for sophisticated means describes offense conduct "pertaining to the execution or concealment of an offense.") (emphasis in original). By initially returning their money, Hsu was able to collect more investor money over time and enlarge the scheme. And ultimately,

-17-

when Hsu needed his Ponzi scheme to continue to grow, Hsu fostered close relationships with famous politicians through his campaign-finance fraud.

Hsu's scheme was deliberate, well-plotted, and demonstrates a higher level of intricacy than the con-man who merely scams a handful of investors out of money on a short-term basis. He used his own expertise as a businessman (including an MBA from the prestigious Wharton School at the University of Pennsylvania), bootstrapped with false documents and fraudulently-induced references from famous politicians, to perpetrate a ten-year long fraud, swindling numerous sophisticated investors out of tens of millions of dollars. An enhancement is clearly justified on these facts.

## IV. Number of Victims

The PSR correctly calculated the number of victims of Hsu's fraud as in excess of 250. As was noted above, many investment funds had scores of victim-investors. The following is not an extensive list of the victims of Hsu's fraudulent scheme, but rather enough to comfortably prove that the number of victims exceeds 250:

> 1. **Source Financing Investors, LLC ("Source")**: A total of 113 victims invested in Hsu via Source. (Tr. 54-55). [Tab 17].
>
> 2. **Briar Wood Investments, LLC ("Briar Wood")**: A total of 108 victims invested in Hsu via Briar Wood. (Tr. 105, 111).

3. **K-1 Financial Investments ("K-1"):** A total of 25 victims invested in Hsu via K-1. (Tr. 133-34).

4. **Dilini Management Group, LLC ("Dilini"):** A total of 11 victims invested in Hsu via K-1. [Tab 18].

5. **Nicole Chorvat**

6. **Solange Sandy**

7. **Brian Miller**

8. **Britt Miller**

9. **Susan Chilman**

10. **April Chu**

11. **Albert Choi**

## V. The Defendant Is Not Entitled to Credit for Acceptance of Responsibility

Hsu argues that, because he pled guilty to mail and wire fraud charges prior to trial, he should benefit from an adjustment for acceptance of responsibility as to that group of offenses. Hsu fails to cite a single case in support of the proposition that a defendant is entitled to such an adjustment where he pleads guilty to certain of the charges prior to trial. Moreover, his argument fundamentally misconstrues the manner in which the Sentencing Guidelines function.

The Sentencing Guidelines do not countenance a group-by-group approach to the application of U.S.S.G. § 3E1.1. Acceptance of responsibility is a unitary concept that applies either to all of a defendant's criminal conduct or none and is

applied after the grouping rules.  This legal conclusion is
obvious from the manner in which the Sentencing Guidelines direct
that, <u>first</u>, the grouping rules (Chapter Three, Part D) are
applied to each separate group of offenses and, <u>then and only</u>
<u>then</u>, do the Sentencing Guidelines direct that the acceptance of
responsibility provision (Chapter Three, Part E) be applied.  <u>See</u>
<u>United States</u> v. <u>Eng</u>, 14 F.3d 165, 171 & n.3 (2d Cir. 1994) ("we
note, however, that adjustments for acceptance of responsibility
under Part E of Chapter Three are made <u>only after</u> the counts are
combined.") (emphasis added); U.S.S.G. § 1B1.1(d-e) (directing
that grouping rules be applied and then acceptance of
responsibility provision be applied).  This result is further
supported by the commentary to the grouping rules, which make
clear that the acceptance of responsibility provision is applied
<u>only after</u> the grouping rules are applied.  U.S.S.G. Ch. 3, Pt.D,
intro. comment ("[t]he single, 'combined' offense level that
results from applying the[ rules regarding multiple counts] is
used, after adjustment pursuant to the guidelines in subsequent
parts [<u>i.e.</u>, Part E - acceptance of responsibility] to determine
the sentence"); U.S.S.G. § 3D1.1, comment. ("[t]his section
outlines the procedure to be used for determining the combined
offense level.  After any adjustments from Chapter 3, Part E
(Acceptance of Responsibility) . . . are made, this combined
offense level is used to determine the guideline sentencing

range"); U.S.S.G. § 3D1.5, comment. ("The combined offense level is subject to adjustments from Chapter Three, Part E (Acceptance of Responsibility)" (emphasis added).

There is no basis in law for Hsu's argument, and it should be squarely rejected by this Court. Indeed, Application Note 2 for this Section explicitly counsels that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt [and] is convicted[.]" Application Note 2, U.S.S.G. § 3E1.1. Here, Hsu indisputably put the Government to its burden, his plea to certain charges notwithstanding. The Government's case-in-chief included testimony from at least a dozen witnesses, many of whom were also Hsu's victims, and thousands of pages of financial and business records. The fact that Hsu pled guilty two days prior to trial to certain of the charges – particularly given the overwhelming proof against him, including his confession – hardly justifies a reduction in his sentence.

**VI. The Obstruction of Justice Enhancement Applies Because the Defendant Willfully and Materially Committed Perjury in His Affidavit and in His Sworn Testimony.**

    A.   Relevant Facts

Prior to trial, Hsu submitted a declaration in support of a motion to suppress his statements to law enforcement (cited herein as "Hsu Declaration"), and subsequently testified at the

suppression hearing. This Court rejected his claim, finding that the statements were made voluntarily and not as a result of Hsu's allegedly weakened physical and mental condition. The Government submits that the defendant's perjurious declaration and testimony merit an obstruction-of-justice enhancement under the Sentencing Guidelines.

B. Applicable Law

The Guidelines authorize a two-level upward adjustment:

> [i]f ... the defendant ... attempted to obstruct or impede[] the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and ... the obstructive conduct related to ... the defendant's offense of conviction and any relevant conduct ....

U.S.S.G. § 3C1.1. As the Supreme Court has explained, an enhancement for obstruction of justice is appropriate when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993). Thus, the Second Circuit held in United States v. Zagari, 111 F.3d 307 (2d Cir.1997), that before applying an obstruction enhancement based on perjury, the sentencing court must find by a preponderance of the evidence "that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." Id. at 329; cf.

<u>Garcia</u>, 413 F.3d at 220 n.15 ("Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives <u>Booker</u>."). In other words, "[b]efore imposing the adjustment, the district court must find that the defendant 'consciously act[ed] with the purpose of obstructing justice.'" <u>United States</u> v. <u>Lincecum</u>, 220 F.3d 77, 80 (2d Cir. 2000) (quoting <u>United States</u> v. <u>Case</u>, 180 F.3d 464, 467 (2d Cir.1999)); <u>see also</u> <u>United States</u> v. <u>Agudelo</u>, 414 F.3d 345 (2d Cir. 2005) (denying the obstruction enhancement where there was no obvious lie); U.S.S.G. § 3C1.1, Application Note 2. The obstruction may arise from a false affidavit submitted in connection with a suppression motion. <u>See</u> <u>Lincecum</u>, 220 F.3d at 80-81.

C. <u>Discussion</u>

Here, Hsu should receive the two-point enhancement for obstruction of justice, because he willfully and materially committed perjury and submitted a false affidavit in connection with his motion to suppress. First, in his sworn declaration, Hsu purported to be disoriented and weak at the time of his FBI interview, and claimed that while he remembered "sp[eaking] to the FBI agents for a very long period of time" he did not remember "everything [that he] told the agents." Hsu Declaration, at ¶ 25. Hsu further stated that he "kn[e]w" that he "told them many things about my business and about my activities as a political fundraiser." <u>Id</u>. Hsu implicitly

-23-

disavowed any memory of signing a form confirming that he had

been advised of his right to a lawyer and to remain silent (only

acknowledging, as he had to, that he had "seen documents"

indicating that he had waived those rights) and asked this Court

to suppress the statements to the agents because of his "fragile

mental and physical state" and the agents' (unspecified) efforts

to overbear his will.  Hsu Declaration at ¶ 27.  Second, Hsu

testified under oath that he had absolutely no recollection of

any of his statements during his three-hour interview by the FBI,

but – as the Court noted in rejecting Hsu's suppression claim –

Hsu testified that he "clearly remember[ed] complaining to the

agents before the interview began about the conditions of his

confinement."  Hearing Tr. at 199-201.  Moreover, while Hsu again

claimed at the hearing that he was in a weakened physical state,

this Court's opinion pointed out that Hsu's "assertion . . .

[wa]s contradicted by the credible testimony" of law enforcement

witnesses "as well as the Mesa County Jail's medical notes."

Decision and Order, United States v. Hsu, 07 Cr. 1066 (VM), at

10.  While the Court did not specifically find that Hsu perjured

himself at the hearing, the Court clearly failed to credit Hsu's

testimony, stating that "Hsu's selective memory of the[] events

casts substantial doubts on the credibility of his testimony."

Id.

The Government submits that Hsu deliberately lied about a

material matter when he denied – both in his affidavit and in his testimony – remembering any of the statements made to the agents during his three-hour interview.  Both of the FBI agents were found credible by this Court, and their testimony about Hsu's courteous and calm demeanor belie Hsu's self-serving description of himself as severely weakened and confused.  By testifying falsely, Hsu obstructed the administration of justice, and his Guidelines range should reflect his obstructive conduct.

## VII. Section 3553(a) Factors

In determining a reasonable sentence, the sentencing judge is required to consider the factors set forth at 18 U.S.C. § 3553(a).  These factors include, among others, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; and the need for deterrence and to protect the public from further crimes of the defendant.  See 18 U.S.C. § 3553(a).

### A.  Nature and Circumstances of the Offense, History and Characteristics of the Defendant

Under Section 3553(a)(1), the sentencing court must first consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Section 3553(a)(2)(A) sets forth a related proposition that the sentence should "reflect the seriousness of

-25-

the offense, [] promote respect for the law, and [] provide just punishment for the offense."

As the Court is aware, the defendant's crimes have had a devastating impact on hundreds of investor-victims, as many of them testified at trial. Martin Waters, for one, was forced to declare bankruptcy after Hsu wrote him millions of dollars in worthless checks. Charles Mack, who invested through Waters' fund, is an 83-year old man who was forced to move out of his home because he was left penniless by Hsu's Ponzi scheme. And, as she testified at trial, Solange Sandy lost hundreds of thousands of dollars from her divorce settlement in the wake of the scheme's collapse. While some of the investor-victims did not lose money, many of them lost millions, and even those who did not go bankrupt were nonetheless impacted by the scheme, losing the trust of friends and colleagues to whom they recommended Hsu's phony investment scheme. Many of the victims, including Suzanne Raffaelli and Winkle and Marina Paw, experienced deep personal loss over the demise of their relationships with Norman Hsu, whom they believed to be a loyal and trustworthy friend.

Hsu's crime did not involve a single lie or misrepresentations made to strangers. Rather, Hsu repeatedly lied on a daily basis to people who considered him to be a dear friend or a member of their family. This fact speaks volume

about the nature of this defendant.

In comparison with many defendants that appear before this Court, the defendant has had significant advantages and opportunities in life.  The backdrop of relative advantage that Hsu has enjoyed renders his conduct all the more inexcusable – and notably, Hsu offers absolutely no mitigating factors that would serve as a basis for obtaining a non-Guidelines sentence. Nor does he attach a single letter from anyone who can speak of him in positive terms, as virtually all defendants manage to do.

In short, nothing about the defendant's background or the nature and circumstances of this offense weighs in favor of mitigating Hsu's sentence by varying from the applicable guideline range.

**B.    The Need To Reflect The Seriousness Of The Offense, Promote Respect For The Law And Provide Just Punishment For The Offense/ The Need To Afford Adequate Deterrence To Criminal Conduct**

The offense at issue here was an extensive and elaborate scheme that Hsu perpetrated for nearly a decade.  This was not aberrational conduct for Hsu.  Furthermore, this was not Hsu's first encounter with the criminal justice system.  As the Court knows, and as the parties stipulated at trial, Hsu was previously convicted on state fraud charges in 1992 and is currently serving a three-year sentence for that crime.  Court records demonstrate that Hsu's prior fraud resulted in investor losses of at least $1 million.  Obviously, Hsu's prior involvement with the criminal

justice system did not serve to deter him from committing the instant offense. Given Hsu's recidivism, and given his propensity to lie when it serves his interest, a significant sentence is necessary to protect the public from future fraudulent activity by Hsu.

As for the need to deter criminal conduct, should Hsu, who perpetrated a $50 million fraud while capitalizing on the trust of those around him, be spared a substantial sentence of incarceration, it would send a woefully inadequate message to others contemplating similar behavior.

## VIII. Restitution

The Government is presently in the process of finalizing its list of victims to whom the defendant must pay restitution. The Government is calculating this by comparing whether the amount of money an individual victim paid into Hsu's bank accounts is greater than the amount of money that the victim received from those same accounts. In the event that, on net, the victim put in more than he or she received in return, that victim is entitled to restitution to make up for the difference. The Government hopes to have that completed list to the Court before next week's sentencing. However, due to the size of the task, the Government may request an additional 90 days, pursuant to 18 U.S.C. § 3664(d)(5), to complete the restitution portion of the judgment.

## **Conclusion**

For the reasons set forth above, the Government submits
that, based on the factors set forth in Section 3553(a), a
reasonable an appropriate sentence is a sentence within the
applicable advisory guidelines range.  The Government also
respectfully submits that such a sentence is not greater than
necessary to fulfill the foregoing sentencing factors enumerated
in Section 3553(a).

Dated:      New York, New York
            September 23, 2009

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                    By:    /s/ Alexander J. Willscher
                           Rua M. Kelly/Alexander J. Willscher
                           Assistant United States Attorneys
                           (212) 637-2471/2736